# EXHIBIT 17

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JOHN AND JANE DOES,<br>*Plaintiffs*,<br>v.<br>DEMOCRATIC PEOPLE'S REPUBLIC OF KOREA,<br>*Defendant*. | Civil Action No. 23-273 (TJK) |

# MEMORANDUM OPINION

In January 1968, North Korea chased down and captured the U.S.S. Pueblo in international waters, killing one of the ship's crew and taking the rest hostage. For the next eleven months, North Korea beat, starved, interrogated, and tortured the survivors to extract false confessions from them. Before the year was up, North Korea got the admission and the apology that it wanted from the United States for supposedly violating North Korean territorial waters. And the hostages, having served their purpose, were released. This case is the latest of several in which some of the Pueblo's crew members, their families, and their estates sued North Korea under the Foreign Sovereign Immunities Act and state tort law. North Korea failed to appear, and Plaintiffs moved for default judgment. For the reasons below, the Court will grant their motion and award long-overdue compensation to these victims of state-sponsored terrorism.

## I. Background

### A. Findings of Fact

#### 1. The Capture of the U.S.S. Pueblo

In January 1968, the U.S.S. Pueblo, a naval auxiliary general environmental research vessel, departed from Sasebo, Japan and sailed toward the Korean Peninsula. ECF No. 48-1 at 21,

AUTHENTICATED
U.S. GOVERNMENT
INFORMATION
GPO

Case 1:23-cv-01027-BAH Document 169 Filed 02/02/26 Page 3 of 32

31, 52. At the time, she carried a crew of eighty-three: six officers, seventy-three Sailors, two Marines, and two civilians. ECF No. 48-2 at 395–97. Though outfitted with two .50-caliber machine guns for self-defense, the Pueblo was assigned a noncombatant mission. ECF No. 48-1 at 43. It operated under orders to remain in international waters, navigating no closer than thirteen miles from the North Korean coastline—standing off no less than one mile from the country's claimed territorial waters. ECF No. 48-1 at 33, 39. Based on these restrictions and other operational assessments, naval command categorized the mission as "minimal risk." ECF No. 48-1 at 33–34, 45.

On the morning of January 23, 1968, the Pueblo was roughly fifteen miles from the island of Ung Do, an uninhabited island off the coast of the North Korean port city of Wonsan. ECF No. 48-1 at 53. Around noon, a North Korean submarine-chasing ship—a "subchaser"—appeared on the horizon, approached, and began circling the American ship. ECF No. 48-3 at 39. The Pueblo attempted to avoid any confrontation. When challenged by the subchaser, the Pueblo raised the American flag and displayed a signal indicating it was engaged in hydrographic research activity. *Id.* at 124. Undeterred, the subchaser hoisted what the Pueblo took as a threat: "heave to or I will open fire." *Id.* at 125. The Pueblo replied, asserting its right to free passage through international waters. *Id.*

Tensions escalated rapidly. Three North Korean patrol boats arrived and positioned themselves around the Pueblo, while two MiG jet-aircraft began circling overhead. ECF No. 48-3 at 39–40. The subchaser sent another message to the Pueblo: "follow in my wake, I have pilot onboard." *Id.* at 40. At the same time, the Pueblo's crew spotted a boarding party gathering on the subchaser's deck armed with rifles and fixed bayonets. *Id.* at 126. Attempting to buy space and time, the Pueblo's captain ordered the ship turn away from North Korean waters and increase speed. *Id.* But the North Korean vessels gave chase. The subchaser opened fired with its 57mm

cannons and the patrol boats joined in, raking the Pueblo with machine gun fire. *Id.* at 127. Three cannon rounds struck the ship, wounding several crew members. *Id.* In the face of an overwhelming force, and to avoid further casualties, the captain gave the order to halt and comply. ECF No. 48-2 at 172–73. The Pueblo ceased evasive maneuvers and began following the subchaser west toward North Korea. *Id.*

Soon after, the Pueblo stopped again, this time to stall for time to allow the crew to destroy classified materials and equipment. ECF No. 48-2 at 173. In response, the subchaser unleashed another volley of 57mm cannon fire, seriously wounding several crew members. ECF No. 48-3 at 41. One Sailor soon died from his injuries. *Id.* The Pueblo resumed its course under escort. After about half an hour, the subchaser signaled for the Pueblo to stop. *Id.* The U.S. ship complied. ECF No. 48-2 at 176. A North Korean boarding party came aboard, seized control of the ship, and took its crew into custody. *Id.*

Later that evening, under the control of North Korean military personnel, the Pueblo docked at a pier in Wonsan, North Korea. ECF No. 48-3 at 41. The eighty-two surviving crew members, bound and under guard, disembarked their ship for the last time. *Id.*

### 2. The Crew's Captivity and Its Long-term Effects

Over the next eleven months, the Pueblo's crew endured several "systemic and organized periods of intensified physical and psychological abuse" at the hands of their North Korean captors. ECF No. 48-3 at 150. For the first six weeks, the men were confined in a facility they came to call "the [B]arn." ECF No 48-3 at 395. There, they faced constant interrogations, repeated physical beatings, and sustained psychological pressure. *Id.* Guards forced them to their knees at gunpoint, threatening them with death if they did not confess to intruding in North Korean waters. ECF No. 48-3 at 162. The harsh conditions at the Barn exacerbated the crew's suffering, compounding injuries sustained from the shelling of the Pueblo and the abuse inflicted by the

guards. Rats infested the hallways and bathroom, and at least one crew member developed an infection from bed-bug bites. *Massie v. Gov't of Democratic People's Republic of Korea*, 592 F. Supp. 2d 57, 63–64 (D.D.C. 2008).[1] For over a month, the men were denied showers. *Id.* at 65. As one account noted, they "were covered in their own blood and in some cases their own feces." *Id.* In early March, the hostages were moved to a second detention facility on the outskirts of Pyongyang, referred to as the "Farm." *Id.* at 66. Though the location had changed, the conditions remained grim. *Id.* Rough treatment and coercive tactics remained the rule. *Id.*

In late March and early April, the crew endured what they called the "[P]urge"—a two-week stretch of particularly brutal beatings designed to extract forced confessions. ECF No. 48-3 at 154. During interrogation sessions, guards struck the crew members with karate-style blows, punched them repeatedly, and inflicted other forms of physical violence. *Id*. at 154, 187. Signs of abuse were commonplace: "crew members were regularly seen with red faces, bleeding noses, and busted lips, or holding their sides from being punched." *Doe v. Democratic People's Republic of Korea Ministry of Foreign Affs. Jungsong-Dong*, 414 F. Supp. 3d 109, 119 (D.D.C. 2019) ("*Pueblo I*") (internal quotations omitted). Communication between captives was forbidden, and those caught speaking to one another were severely punished. *Massie*, 592 F. Supp. 2d at 67. At least one crew member was beaten unconscious for refusing to sign signing a letter dictated by his

[1] In addition to the record before it, the Court draws from the findings of two previous cases: *Massie*, 592 F. Supp. 2d 57, and *Doe v. Democratic People's Republic of Korea Ministry of Foreign Affairs Jungsons-Dong*, 414 F. Supp. 3d 109 (D.D.C. 2019). True, a court may not "simply adopt previous factual findings without scrutiny." *Worley v. Islamic Republic of Iran*, 75 F. Supp. 3d 311, 319 (D.D.C. 2014). But "[t]he court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). As noted above, the Pueblo incident has given rise to other cases and in similar litigation "[c]ourts in this District have . . . taken judicial notice of earlier, related proceedings." *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 171 (D.D.C. 2010). This action arises out of the same facts as *Massie* and *Pueblo I*. In making its own independent findings of fact, the Court takes judicial notice of those presented in those cases.

captors, intended for his family. *Id*. Over time, the accumulation of such mistreatment took its toll. Faced with the threat of continued violence, the crew members eventually "gave false confessions of guilt for operating a 'spy' ship in North Korean territorial waters." *Id.*

Although the intensity of the violence lessened after the Purge, the abuse did not end. ECF No. 48-3 at 154. From mid-April to December, the crew reported "light treatment," although the North Koreans still "rewarded [them] with occasional kicks, punches, and hits with rifle butts" for slight or imagined infractions. *Id.* During this period, the North Koreans endeavored to "convince the crew members of the injustices of the U.S." through lectures, films, and field trips. ECF 48-2 at 359 (quotation omitted). They also pressured the crew to write to their families and Congress, falsely declaring that they were being treated humanely and expressing remorse for spying and intruding into North Korean waters. *Massie*, 592 F. Supp. 2d at 67. Crew members were beaten when they refused. *Id.*

The North Koreans also forced the crew to participate in propaganda press conferences. ECF No. 48-3 at 341. In one quiet act of resistance, the crew members raised their middle fingers in photographs, telling their captors it was a "Hawaiian Good Luck Sign." *Pueblo I*, 414 F. Supp. 3d at 119. Unfortunately for the crew, a U.S. magazine published the photo and explained the true meaning of the gesture. ECF No. 48-3 at 219. Embarrassed by the act of defiance, the North Koreans commenced a campaign of violence in December 1968, a period the crew called "Hell Week." *Pueblo I*, 414, F. Supp. 3d at 119.

During Hell Week, hostages were dragged out of their rooms and "beaten with weapons ranging from belts, boards, boots and buckles," many to the point of unconsciousness. *Massie*, 592 F. Supp. 2d at 68. Some were forced to hold chairs above their heads until they collapsed from exhaustion, only to be kicked and beaten where they fell. *Id.* In at least one instance, a crew member who dropped his chair was hit with it until it shattered. *Id.* The guards then "used

broomsticks as a substitute." *Id.* These sessions often lasted for hours, leaving "the torture rooms [] covered in blood." *Id.* The captain of the Pueblo described this period as "the most concentrated form of terror that [he'd] seen or dreamed [] possible." ECF No. 48-3 at 199.

Abruptly, in mid-December, the beatings stopped. The crew received new uniforms, better food, heat for their quarters, and rudimentary medical treatment. *Pueblo I*, 414 F. Supp. 3d at 119; ECF No. 48-3 at 165. After eleven months in captivity, the United States and North Korea reached an agreement for the crew's release. *Pueblo I*, 414 F. Supp. 3d at 119. As a condition of that agreement, the North Korean negotiator required his American counterpart "to sign a formal statement" acknowledging that the Pueblo "had illegally intruded into [North Korea's] territorial waters . . . on many occasions and conducted espionage activities." ECF No. 48-1 at 23.

The crew was transferred from the Farm to Kaesong, a North Korean city on the border with South Korea. *Massie*, 592 F. Supp. 2d at 68. On December 23, 1968, the hostages were taken by bus to a bridge between the two countries at the village of Panmunjom. *Id.* at 69. The North Koreans told the crew to cross the bridge one-by-one and that if they said or did anything while crossing the remaining hostages would be shot. *Id.* The eighty-two surviving crew members of the U.S.S. Pueblo safely crossed and were repatriated to the United States. They brought with them the body of their deceased shipmate. *Id.*

At the time of their repatriation, every crew member suffered from malnutrition. ECF No. 48-3 at 149. Average weight loss was twenty-four pounds, with some crew members having lost up to seventy. *Id.* Several crew members had broken bones, including jaws and ribs. *Id.* Along with their physical injuries, many crew members went on to suffer from post-traumatic stress disorder as a result of the ordeal. *Pueblo I*, 414 F. Supp. 3d at 120. The scars from their time in captivity, both seen and unseen, marred the crew long after their return home, as "[m]en who once had been outgoing fathers, husbands, and friends became angry, reclusive, or withdrawn." *Id.*

Both during and after their captivity, the crew members were not the only ones who suffered. One spouse, worried sick, had "frequent nightmares" and "lost nearly 30 pounds from [her] 5-foot-2-inch frame" over the eleven months. ECF No. 41-1 at 32. Another spouse turned into "a nervous wreck" who was "always shaking" and "didn't eat," instead choosing to "drink[] . . . often late into the night" until "pass[ing] out." *Id.* at 155–56. The mother of one crew member "cried continually" and "bit her fingernails to the point of making them bleed," his father becoming "angry and withdrawn" and "quarrelling" often. ECF No. 41-4 at 92. The children suffered too. Though many were too young to understand the nature of the Pueblo incident at the time, *see, e.g.*, ECF No. 41-7 at 128–29, they all were aware afterward how their fathers' time in captivity changed them, with many reporting that their fathers went from "happy and fun-loving" to "physically violent," easily "enraged," and "brutal." ECF No. 41-5 at 168–70; *see also, e.g.*, ECF No. 41-1 at 39 (reporting that her father became an "alcoholic" and would "beat [her] with whatever he got his hands on"); ECF No. 41-7 at 131 (reporting that his father was "drunk practically every day" upon his return and was "verbally and physically abusive"). Several families did not weather the aftermath and broke under the emotional strain. *See, e.g.*, ECF No. 41-6 at 146 (divorce); ECF No. 41-7 at 132–33 (divorce); ECF No. 41-10 at 74 (divorce).

**B. Procedural History**

Plaintiffs—some of the surviving Pueblo crew, the estates of the deceased crew, their family members, and the estates of their family members—sued North Korea in January 2023. *See* ECF No. 1. In April 2023, they filed an amended complaint. ECF No. 8. In September 2023, they filed a second amended complaint, which now serves as the operative complaint. ECF No. 13. The operative complaint contains claims under the Foreign Sovereign Immunities Act ("FSIA"), *see* 28 U.S.C. § 1605A(c), and District of Columbia common law. ECF No. 13 ¶¶ 6, 40–67.

Plaintiffs then proceeded through the four methods required to effect service on a foreign sovereign under 28 U.S.C. § 1608. Service was unavailable under § 1608(a)(1) because the United States lacks a "special arrangement" for service with North Korea, and service under § 1608(a)(2) was similarly unavailable because North Korea is not a party to any applicable "convention on service of judicial documents." ECF No. 19-1 (quoting § 1608(a)). Plaintiffs thus attempted the third method of service, sending a package of service documents "by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs." § 1608(a)(3). The service package could not be sent to North Korea proper, however, because Plaintiffs represented that no commercial couriers delivered into the country since DHL suspended service during the COVID-19 pandemic. ECF No. 19-1 at 2. The Clerk of Court thus dispatched Plaintiffs' service package to the Permanent Mission of Democratic People's Republic of Korea to the United Nations in New York, a diplomatic outpost of North Korea. ECF No. 21 at 2. The Permanent Mission refused to accept delivery of the package. ECF No. 22 at 5.

That left the fourth method, service through formal diplomatic channels via the State Department under § 1608(a)(4). Rather than attempt this method, however, Plaintiffs asserted that such service was "impossible" because "the United States does not have diplomatic relations with North Korea" and requested to serve North Korea "by alternative means." ECF No. 22 at 5. The alternative means chosen were service "by publication on X and by email." *Id.* at 6. The Court deemed these alternative means "permissible . . . pursuant to Fed. R. Civ. P. 4(f)(3)." Minute Order of December 14, 2023. After service by X and email produced no response, Plaintiffs moved for default judgment. *See* ECF No. 40.

The Court then came to "identif[y] concerns" with Plaintiffs' alternative means of service. Minute Order of September 26, 2025. Rule 4(f)(3) can be used only when "'serving an individual in a foreign country,' not when serving a foreign state." *Id.* (quoting Fed. R. Civ. P. 4(f)(3)).

Service on a foreign state must instead be made "in accordance with 28 U.S.C. § 1608." *Id.* (quoting Fed. R. Civ. P. 4(j)(1)). To rectify the error, the Court held a hearing in October 2025 and instructed Plaintiffs to attempt service under § 1608(a)(4), however that could best be done. In March 2026, Plaintiffs reported that the State Department had "successfully delivered" the service package "to North Korea's U.N. Mission in New York" on March 2, 2026. ECF No. 58 at 1. After 60 days passed—the window for North Korea to respond to their complaint under § 1608(d)—Plaintiffs recommenced default proceedings, and the Clerk of Court docketed an entry of default. *See* ECF Nos. 63, 64. Plaintiffs then filed a renewed Motion for Default Judgment. *See* ECF No. 65-1. That Motion is now ripe, as supplemented by Plaintiffs' updated Proposed Findings of Fact, ECF No. 61.

## II. Legal Standard

The Court may enter a default judgment "when the adversary process has been halted because of an essentially unresponsive party." *H.F. Livermore Corp. v. Aktiengesellschaft Gebruder Loepfe*, 432 F.2d 689, 691 (D.C. Cir. 1970). Before moving for that relief, a plaintiff must first obtain an entry of default from the Clerk. *See* Fed. R. Civ. P. 55(a), (b). Even when a defendant fails to respond to a lawsuit and has an entry of default entered by the Clerk, however, "the entry of a default judgment is not automatic." *Mwani v. bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005). The non-adversarial posture does not remove the need for the Court to "satisfy itself that it has personal jurisdiction" over the "absent defendant," *id.*, as well as subject-matter jurisdiction to hear the suit, *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1092 (D.C. Cir. 1992).

Additionally, in the FSIA context, "[n]o judgment by default shall be entered . . . unless the claimant establishes his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e). "[P]recisely how much and what kinds of evidence the plaintiff must provide" is left to the discretion of the court. *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044,

1047 (D.C. Cir. 2014). But the court should "adjust evidentiary requirements" to the situation, keeping in mind that "direct evidence" of unlawful activity abroad will often "be unavailable" and that "indirect evidence" will often need to suffice. *Id.* at 1048 (quotation omitted). Courts should especially not impose too high an evidentiary burden when plaintiffs bring suit under the FSIA's terrorism exception, 28 U.S.C. § 1605A, which Congress passed to "hold[] state sponsors of terrorism responsible for their crimes," even when the record is sparse on account of the foreign sovereign having "kill[ed]" or "intimidate[ed]" the witnesses best able to testify. *Id.* at 1048–49.

## III. Analysis

### A. The Court Has Jurisdiction Over Plaintiffs' Claims

#### 1. Subject-Matter Jurisdiction

The Court finds that it has subject-matter jurisdiction over this case. Section § 1330 grants original jurisdiction to district courts in "[1] any nonjury civil action [2] against a foreign state . . . [3] as to any claim for relief in personam with respect to which [4] the foreign state is not entitled to immunity." 28 U.S.C. § 1330(a). The first three of these statutory requirements for jurisdiction are easily satisfied. First, default judgments under the FSIA are nonjury civil actions. *Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 210 (D.D.C. 2012). Second, "North Korea is a foreign state" as contemplated by § 1330. *Doe*, 414 F. Supp. 3d at 123. Third, this action is *in personam*—not *in rem*—because, as discussed below, the Court is exercising "personal jurisdiction over the defendant[] as [a] legal person[], rather than property." *Pueblo I*, 414 F. Supp. 3d at 123 (quoting *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 65 (D.D.C 2010)). That leaves the final requirement, immunity.

Foreign states are entitled to a "presumption of immunity" under the FSIA for which "the plaintiff bears the initial burden to overcome." *Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*, 734 F.3d 1175, 1183 (D.C. Cir. 2013). To overcome this burden and unlock the court's

subject-matter jurisdiction, plaintiffs must seek "money damages" from a foreign state "for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act" perpetrated by a foreign state. 28 U.S.C § 1605A(a)(1). Here, Plaintiffs are seeking monetary damages from North Korea for various injuries suffered by crew members and their families. ECF No. 1 ¶ 70. To rebut the presumption of immunity, Plaintiffs must show that North Korea's conduct (1) "qualifies as one of the FSIA's enumerated predicate acts" and (2) "caused" those injuries. *Wang v. Islamic Republic of Iran*, No. CV 22-583 (TJK), 2025 WL 785736, at *5 (D.D.C. Mar. 12, 2025).

Focusing first on the predicate acts themselves, the Court evaluates whether North Korea's conduct qualifies under § 1605A(a) as "torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act." § 1605A(a)(1). Plaintiffs have established that two of these acts happened: torture and hostage taking.

North Korea's treatment of the crew satisfies the legal definition of torture. The FSIA draws its definition of torture from the Torture Victim Protection Act of 1991 (TVPA). 28 U.S.C. § 1605A(h)(7). The TVPA, in turn, defines "torture" as:

> any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering . . . whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind.

Torture Victim Protection Act of 1991, Pub. L. No. 102–256, 106 Stat. 73 (Mar. 12, 1992). The Pueblo's crew was held in austere conditions and endured physical and psychological suffering for more than ten months. During that time, North Korean guards clubbed the crew with "sticks and belts," forced them into uncomfortable stress positions "for periods as long as 16 hours," conducted mock executions, and left the crew severely malnourished, with an average weight loss

of "24 pounds." ECF No. 48-3 at 149. These acts were not isolated or spontaneous events; they were "constant," and their severity was "carefully controlled." *Id.* at 150. All evidence suggests that North Korea's actions were part of a deliberate effort to extract confessions, gather intelligence, and punish the crew. *See* ECF No. 48-3 at 42, 154, 174 –76. No other conclusion can be drawn from the record other than that "North Korea committed acts of torture." *Pueblo I*, 414 F. Supp. 3d at 126; *see also Massie*, 592 F. Supp. 2d at 66.

North Korea's treatment of the crew also satisfies the legal definition of hostage taking. The FSIA draws its definition of hostage taking from Article 1 of the International Convention Against the Taking of Hostages. 28 U.S.C. § 1605A(h)(2). The International Convention, in turn, defines "hostage-taking" as an act where a "person . . . seizes or detains and threatens to kill or injure . . . another person" to "compel a third party" to take or not take a desired action. International Convention Against the Taking of Hostages art. 1, Dec. 18, 1979. A necessary element of "hostage taking" is the existence of a "*quid pro quo*" arrangement where the release of the hostages depends on the "performance or non-performance" of an action by a third party. *Simpson v. Socialist People's Libyan Arab Jamahiriya*, 470 F.3d 356, 360 (D.C. Cir. 2006) (internal quotation marks and citation omitted).

Such a quid pro quo existed here. Indeed, North Korea hardly tried to hide its aim in continuing to hold the Pueblo crew members. In negotiations, North Korean officials repeatedly represented to their American counterparts that the "crew would be released" if the United States signed a "document of apology and assurance" for violating North Korean territorial waters. ECF No. 48-3 at 223.[2] And the crew was finally handed back to the United States on the very same day

[2] While the United States eventually did issue such an apology, the American official who signed the document stated that he was only doing so to secure the release of the crew, ECF No. 48-1 at 23–24. An inquiry into the incident found that "at no time during its mission did the U.S.S. Pueblo ever penetrate North Korean territorial waters." *Id.* at 56.

the lead American negotiator signed such a document. ECF No. 48-2 at 241. In short, North Korea "seiz[ed]" and "detain[ed]" the Pueblo's crew to "compel" the United States "to take . . . a desired action"—issue the apology. *See* International Convention Against the Taking of Hostages art. 1, Dec. 18, 1979. These actions are in lockstep with the FSIA's definition of hostage taking.

Having found that North Korea's actions qualify as predicate acts under the FSIA, the Court considers whether those actions caused Plaintiffs' injuries. Under FSIA, this "require[s] only a showing of 'proximate cause.'" *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1128 (D.C. Cir. 2004) (citation omitted). Proximate cause requires that the actions in question have played a "substantial factor" in the injuries, with the injuries of the sort "reasonably foreseeable" as a result of the actions. *Frost v. Islamic Republic of Iran*, 383 F. Supp. 3d 33, 48 (D.D.C. 2019). There is no question this standard is satisfied here. The capture of the crew, the conditions of confinement, and the physical and psychological abuse were *why* the crew members suffered the injuries they did. And not only were Plaintiffs' injuries the "foreseeable consequence" of the conduct—they were apparently the *intended* consequence.

For these reasons, North Korea's conduct that caused Plaintiffs' injuries—torture and hostage taking—falls within the terrorism exception of the FSIA and is not shielded by sovereign immunity. Thus, the Court has subject-matter jurisdiction under § 1330.

**2. Personal Jurisdiction**

Under the FSIA, personal jurisdiction exists where two conditions are met: the Court has subject-matter jurisdiction, and the foreign state has been properly served under § 1608(a). 28 U.S.C. § 1330(b). As established above, the Court has subject-matter jurisdiction. And as established below, North Korea has been properly served.

Section 1608(a) prescribes four methods for serving a foreign state, and "strict adherence" to its terms "is required." *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 154 (D.C.

Cir. 1994). The terms require that a plaintiff step through each of the four methods sequentially, moving on to the next only when the earlier methods are unavailable. For North Korea, the first two methods are unavailable. The United States has no "special arrangement for service" with North Korea, *see* § 1608(a)(1), nor is there relevant "international convention on service of judicial documents" to which both the United States and North Korea are parties, *see* § 1608(a)(2). *See also Pueblo I*, 414 F. Supp. 3d at 125.

Plaintiffs attempted the third method of service by requesting that the Clerk of Court dispatch a service package to the Permanent Mission of Democratic People's Republic of Korea to the United Nations in New York, a diplomatic outpost of North Korea. ECF No. 21 at 2; ECF No. 19 at 1. But the Permanent Mission refused to accept delivery of the package. ECF No. 22 at 5. After an initially faulty attempt at alternative service via X and email, *see* ECF No. 23 ¶¶ 3–6, Plaintiffs properly effected service via the State Department by delivery to the North Korea's Permanent Mission in New York in March 2026. ECF No. 59. Thus, Plaintiffs have satisfied § 1608(a) and personal jurisdiction is established.

### B. The Court Must Hear Plaintiffs' Claims

Additionally, "[s]ection 1605A requires a district court to hear a claim if" the three conditions of § 1605A(a)(2) are met. *Borochov v. Islamic Republic of Iran*, 94 F.4th 1053, 1066 (D.C. Cir. 2024); *see also Pueblo I*, 414 F. Supp. 3d at 125 (same). First, at the time of the incident or as the result of it, the foreign state in question must have been designated as a state sponsor of terrorism and remain so designated within the six months before the claim is filed. 28 U.S.C. § 1605A(a)(2)(A)(i). Second, the plaintiff must be a U.S. national, a servicemember, or "otherwise in the employ of . . . the United States." *Id.* § 1605A(a)(2)(A)(ii). And third, the plaintiff must have given "a reasonable opportunity to arbitrate the claim" to the foreign state. *Id.* § 1605A(a)(2)(A)(iii). All three are met here.

The first condition relates to the time periods at which the foreign sovereign was designated as a state sponsor of terrorism. North Korea was not so designated at the time of the Pueblo incident. So to satisfy § 1605A(a)(2)(A)(i), any current designation must have been made "as a result of" the Pueblo incident. And as courts have held, "as a result of" means "wholly or in part" in the FSIA context. *Doe*, 414 F. Supp. 3d at 124 (cleaned up); *see also Warmbier v. Democratic People's Republic of Korea*, 356 F. Supp. 3d 30, 44–45 (D.D.C. 2018) (same). The Pueblo incident, then, need only have partially caused North Korea's designation in 2017. *See* Democratic People's Republic of Korea (DPRK) Designation as a State Sponsor of Terrorism (SST), 82 Fed. Reg. 56100–01 (Nov. 27, 2017). It did. Shortly before the 2017 designation, "President Trump cited the capture and torture of the [crew] of the [] Pueblo as among . . . North Korea's terrorist actions." *Doe*, 414 F. Supp. 3d at 124 (citation omitted). Several courts have concluded that the Pueblo incident was a motivating factor in the State Department's decision to redesignate North Korea as a state sponsor of terrorism. *See id.*; *Warmbier*, 356 F. Supp. 3d at 45; *Massie*, 592 F. Supp. 2d at 74. Thus, the Court is satisfied that the 2017 designation was made, at least in part, as a result of the Pueblo incident. Because North Korea also remains designated as a state sponsor of terrorism through today, including in 2023 when Plaintiffs sued, this first condition is satisfied.

The second condition under § 1605A(a)(2) pertains to the relation between the plaintiff and the United States. It is satisfied if "the claimant or the victim" was "a national of the United States," "a member of the armed forces," or "otherwise an employee of the Government of the United States . . . at the time of the act." 28 U.S.C. § 1605A(a)(2)(A)(ii). Courts have interpreted "victims" as "those who suffered injury or died as a result of" an act and "claimants" as those with derivative claims that "arise out of those injuries or deaths but who might not be victims themselves." *Valore*, 700 F. Supp. 2d at 68. Although Plaintiffs here consist of a mix of living Pueblo crew members, the estates of deceased crew members, the crew's families, and the crew's

families' estates, the Court need not confirm the status of each Plaintiff. The Court "shall hear a claim" so long as the claim derives from actions taken against a "victim" who bore the requisite relation to the United States. *Pueblo I*, 414 F. Supp. 3d at 123. Because these claims rest on the actions taken by North Korea against the Pueblo's crew—the "victims"—all of whom were "member[s] of the armed forces . . . at the time of the act," this second condition is straightforwardly satisfied too.

Finally, the third condition requires the defendant foreign state be given a "reasonable opportunity to arbitrate" the claim. A foreign sovereign is given such an opportunity when an offer to arbitrate is included in the package of documents sent to the foreign sovereign as part of service under § 1608(a) and over two months have passed after receipt. *See Simpson v. Socialist People's Libyan Arab Jamahiriya*, 326 F.3d 230, 233 (D.C. Cir. 2003) (interpreting § 1605(a)(7), the predecessor to § 1605A(a)(2)(A)(iii)). North Korea received Plaintiffs' offer to arbitrate on March 2, 2026. *See* ECF No. 59 at 1. Over two months have elapsed since then. Because North Korea had ample time to respond, the Court finds that it was given a "reasonable opportunity."

With all three § 1605A(a)(2) conditions satisfied, the Court turns now to the merits of Plaintiffs' claims.

### C. North Korea is Liable to Plaintiffs

Plaintiffs are composed of three groups, each of which the Court has permitted to proceed pseudonymously for their safety: first, crew members of the Pueblo and their estates;[3] second, crew

[3] Plaintiffs D-1, F-1, I-1, K-1, N-1, Q-1, R-1, T-1, U-1, V-1, Z-1, AA-1, BB-1, CC-1, and FF-1. *See* ECF No. 16-1 at 2–3.

family members who are U.S. nationals and their estates;[4] and third, crew family members who are foreign nationals and their estates.[5]

The first two groups can establish liability directly through the FSIA's statutory cause of action. When a plaintiff relies on the FSIA's § 1605A(c) cause of action, the foreign sovereign is liable whenever it lacks immunity. *See K.E.F.V. by and through Vickers v. Islamic Republic of Iran*, 135 F.4th 988, 991 & n.4 (D.C. Cir. 2025). That is, a plaintiff who "establish[es] a waiver of foreign sovereign immunity under § 1605(a)" also "establish[es] entitlement to relief as a matter of federal law." *Levinson v. Islamic Republic of Iran*, 443 F. Supp. 3d 158, 176 (D.D.C. 2020) (citations omitted).[6]

This cause of action is available for the first group of Plaintiffs: crew members and their estates. The FSIA authorizes "member[s] of the armed forces," as well as their "legal representative[s]," to seek "money damages" from a foreign sovereign for its acts of terrorism. 28 U.S.C. § 1605A(c). Each is or was a U.S. national or member of the armed forces, so they and

---

[4] Plaintiffs E-1, E-2, E-3, E-4, E-5, E-6, E-7, E-9, E-10, E-11, E-12, E-13, G-2, G-4, H-3, J-1, J-2, J-3, J-4, J-5, J-6, K-4, K-5, K-6, L-1, L-2, M-1, P-1, P-2, P-3, Q-3, T-5, U-3, V-3, V-4, V-5, W-1, W-4, AA-4, AA-5, AA-7, CC-2, CC-5, CC-6, DD-1, FF-4, FF-5, and HH-1, as well as G-1, G-3, H-1, H-2, I-4, I-5, I-6, I-7, I-8, I-9, K-2, K-3, K-7, K-8, M-2, N-2, N-3, O-1, P-4, Q-2, S-1, S-2, S-3, T-2, T-3, T-4, U-2, W-2, W-3, X-1, Y-1, Y-2, Z-2, Z-3, Z-4, AA-2, AA-3, AA-6, BB-2, CC-3, CC-4, EE-1, EE-2, FF-2, FF-3, FF-6, FF-7, FF-8, FF-9, GG-1, and GG-2. *See* ECF No. 16-1 at 3–13.

[5] Plaintiffs I-2, I-3, E-8, E-14, and V-2. *See* ECF No. 16-1 at 13–14.

[6] Some courts in this district have understood § 1605A(c) not to provide "guidance on the substantive bases for liability." *Rezaian v. Islamic Republic of Iran*, 422 F. Supp. 3d 164, 178 (D.D.C. 2019) (citation omitted). Under this approach, courts found FSIA liability only after "look[ing] to sources such as state decisional law, legal treatises, or the Restatements in order to find and apply what are generally considered to be the well-established standards of state common law." *Est. of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 24 (D.D.C. 2009) (relying on *Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 333 (D.C. Cir. 2003)). The D.C. Circuit recently clarified that, to the contrary, the substantive bases for FSIA liability are found directly in the text of § 1605A(c). *K.E.F.V. by and through Vickers*, 135 F.4th at 991 & n.4.

their legal representatives have access to the FSIA cause of action. *Id.* §§ 1605A(c)(2), (4). And because the Court has determined that Plaintiffs have met the jurisdictional requirements to disregard North Korea's sovereign immunity, the crew-member Plaintiffs and their estates have established that North Korea is liable.

This same cause of action is also available for the second group of Plaintiffs, Pueblo crew family members who are U.S. nationals and their estates. The FSIA also authorizes "national[s] of the United States" and their "legal representative[s]" to seek damages—including "solatium" damages—from a foreign sovereign. 28 U.S.C. §§ 1605A(c)(1), (4). And because the Court has determined that Plaintiffs have met the jurisdictional requirements to disregard North Korea's sovereign immunity, the crew's U.S. national family members and their estates have established that North Korea is liable.

That said, the FSIA's cause of action is unavailable for the third group of Plaintiffs, crew family members who are foreign nationals and their estates. *See* 28 U.S.C. §§ 1608A(c)(1)–(4) (lacking mention of foreign nationals). Still, the FSIA's cause of action "did not displace" the ability of foreign nationals to "pursue claims under applicable state or foreign law" so long as the foreign state's sovereign immunity has been waived. *Est. of Doe v. Islamic Republic of Iran*, 808 F. Supp. 2d 1, 20 (D.D.C. 2011). Foreign nationals can instead seek to establish liability by "bring[ing] state law claims that they could have brought if the defendant were a private individual." *Oveissi v. Islamic Republic of Iran*, 573 F.3d 835, 841 (D.C. Cir. 2009). Accordingly, the third group of Plaintiffs brings state-law claims for intentional infliction of emotional distress ("IIED"). ECF No. 13 ¶ 64.[7]

[7] Plaintiffs at times also refers to "loss of solatium" alongside their IIED claim, implying that loss of solatium is distinct state tort that provides a parallel cause of action. *See* ECF No. 13 ¶¶ 6, 39, 63, 64. It is not. Solatium is "remedy," *K.E.F.V. by and through Vickers*, 135 F.4th at 991, thus its inclusion in § 1605A(c)'s list of "damages" alongside "economic damages" and

The first step is deciding what law governs these claims. This choice-of-law question is answered under the test provided by District of Columbia law, as "issues governed by state substantive law in FSIA cases should apply the choice-of-law rules of the forum state." *Oveissi*, 573 F.3d at 841. The District of Columbia uses a "two-part test." *Corp. Accountability Lab v. Sambazon, Inc.*, 340 A.3d 1277, 1285 (D.C. 2025). "First, the court must determine whether a true conflict exists between the laws of the jurisdictions at issue," one of which is the law of the District of Columbia itself. *Id.* (quotation omitted). If the laws of the jurisdictions at issue "are identical or would produce the identical result on the facts presented," then there is no true conflict, *id.* (quotation omitted), and "[t]he absence of a true conflict compels the application of District of Columbia law by default," *Pietrangelo v. Wilmer Cutler Pickering Hale & Dorr, LLP*, 68 A.3d 697, 714 (D.C. 2013).

"If a true conflict exists," however, then the court must "evaluate the governmental policies underlying the applicable laws and determine which jurisdiction's policy would be more advanced by the application of its law to the facts of the case under review." *Sambazon, Inc.*, 340 A.3d at 1286 (quotation omitted). As part of this inquiry, the court should "consider the four factors enumerated in the Restatement (Second) of Conflict of Laws § 145." *Id.* Those four factors are: "(a) the place where the injury occurred; (b) the place where the conduct causing the injury occurred; (c) the domicil[e], residence, nationality, place of incorporation and place of business of the parties; and (d) the place where the relationship, if any, between the parties is centered." *Id.* (quotation omitted). If the court "cannot determine" which jurisdiction has a "greater interest in the controversy," the court should again apply District of Columbia law. *Id.* (quoting *Washkoviak v. Student Loan Mktg. Ass'n*, 900 A.2d 168, 182 (D.C. 2006)).

---

"punitive damages." *See also Opati v. Republic of Sudan*, 590 U.S. 418, 428–29 (2020) (labeling solatium as a "categor[y] of special damages").

As in many other FSIA cases, "[t]hree conceivable choices of law are presented in this case": "the law of the forum state," "the laws of the place of the tort," and "the law of the domicile state or country of each [foreign national] plaintiff." *Owens v. Republic of Sudan*, 826 F. Supp. 2d 128, 154 (D.D.C. 2011). Here, those options are the District of Columbia, North Korea, and the Philippines, Florida, and California, respectively. *See* ECF No. 61-1 at 31. In sum, then, the Court should first assess whether there is a conflict between the laws of these five jurisdictions, and then, in the event of a conflict, select the jurisdiction with the greatest interest in the controversy. *See Sambazon, Inc.*, 340 A.3d at 1286.

Fortunately, the Court need not investigate North Korean and Filipino law. Assuming there is a conflict between the laws of those two foreign nations and the laws of the three domestic states, the law of one of the domestic states would prevail. In a case like this one, where the incident at issue is "premised on a state-sponsored terrorist attack" on United States citizens serving in this country's armed forces that was specifically "directed against the U.S.'s national interests," "the United States has a unique interest in having its domestic law—rather than the law of a foreign nation—used." *Wang*, 2025 WL 785736, at *10 (quotations omitted) (cleaned up). Instead, the "real question" is which domestic law applies. *Id.*

The first-step conflict check, then, only needs to be conducted between Florida, California, and District of Columbia law. At first blush, these three jurisdictions have highly similar understandings of IIED, as all three define IIED in line with the Restatement (Second) of Torts. *Compare Metro. Life Ins. Co. v. McCarson*, 467 So. 2d 277, 278–79 (Fl. 1985) *with Alcorn v. Anbro Eng'g, Inc.*, 468 P.2d 216, 219 n. 5 (Cal. 1970) *and with Waldon v. Covington*, 415 A.2d 1070, 1076 (D.C. 1980). But the Restatement traditionally requires the plaintiff asserting IIED to have been physically "present at the time" to observe the alleged outrageous conduct firsthand. *See* Restatement (Second) of Torts § 46 (1965). This is not an ironclad rule—the Restatement provides

a "Caveat" stating that its definition does not purport to be exhaustive, *id.*—but only the District of Columbia's courts have expressly held that the requirement for physical presence does not apply to acts of state terrorism. *See Republic of Sudan v. Owens*, 194 A.3d 38, 42 (D.C. 2018). Given the lack of precedent from Florida and California, it is possible they would decide differently. And if they enforced the presence requirement, the foreign national Plaintiffs would be barred from recovering under their laws—creating a true conflict between the jurisdictions.

The Court thus proceeds on to the second step, assuming that the District of Columbia's IIED standard diverges from Florida's and California's. The choice-of-law analysis at this step is largely inconclusive. The policy underlying each state's tort system is presumably the protection of each state's respective residents, but that fails to decisively tip the balance in favor of any state, because the foreign national Plaintiffs were not all domiciled in the same state at the time of the Pueblo attack. *See* ECF No. 61-1 at 31 n.7. And the four factors laid out in the Restatement do not uniformly point in one direction either. The injury from the emotional distress to the foreign Plaintiffs occurred in their various states of domicile at the time of terroristic conduct; the conduct itself occurred overseas in North Korea; Plaintiffs' identities, including their domicile, residence, and nationality are divergent even within each Plaintiff, *see* ECF No. 41-1 at 115–16 (Plaintiff E-14 currently resides in Florida but is a national of the Philippines); and there is no relationship between the various foreign national Plaintiffs, who have been brought together only because of their shared suffering on account of the Pueblo attack.

In such a situation, where no jurisdiction's interest clearly exceeds the others', the court "must apply the law of the forum state"—that is, the law of the District of Columbia. *Sambazon, Inc.*, 340 A.3d at 1286 (quoting *Washkoviak*, 900 A.2d at 182). This choice is particularly sensible here given the nature of the claims at issue. When the alleged injuries are all caused by a single overseas event affecting many victims at once, there are "interests of uniformity" that make "the

law of the forum state . . . the most appropriate choice of law for all foreign national family members." *Est. of Doe*, 808 F. Supp. 2d at 22 (citing *Kaiser-Georgetown Cmty. Health Plan, Inc. v. Stutsman*, 491 A.2d 502, 509 n.10 (D.C. 1985)). Such a choice also respects Congress's general intention, seen in its recent statutory amendments, to "make FSIA damages more consistent." *Abedini v. Gov't of Islamic Republic of Iran*, 422 F. Supp. 3d 118, 134 (D.D.C. 2019). The Court thus evaluates the foreign national Plaintiffs' IIED claims under District of Columbia law.

Under District of Columbia law, a defendant who engages in "extreme and outrageous conduct" toward a victim is ordinarily liable for IIED to the victim's family members only when the family members are "present at the time" of the conduct and the conduct "intentionally or recklessly" causes "severe emotional distress." *Owens*, 194 A.3d at 41 (quoting Restatement (Second) of Torts § 46). As mentioned above, however, the presence requirement does not apply "in IIED cases where the jurisdictional elements of § 1605A are satisfied and the plaintiff's severe distress arises from a terrorist attack that killed or injured a member of his or her immediate family." *Id.* at 45. Thus, the foreign national Plaintiffs only need to show that they are immediate family of the Pueblo crew members, and that North Korea's conduct toward the Pueblo crew was extreme and outrageous and intentionally or recklessly caused severe emotional distress.

The foreign national Plaintiffs meet all elements of the District of Columbia's terrorism-specific IIED tort. To begin, they are all immediate family of the Pueblo crew. Although the District of Columbia Court of Appeals has not delineated the exact bounds of the term "immediate family," the category presumably contains at least "a person's parents, spouse, children, and siblings." *Weatherly v. Second Nw. Coop. Homes Ass'n*, 304 A.3d 587, 589 n.3 (D.C. 2023); *see also Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 338 (D.C. Cir. 2003) (same). Each of the foreign national family members are "immediate family" under this definition. *See* ECF No. 16-1 at 13–14. As for the character of North Korea's conduct, it should be uncontroversial that

"hostage taking and torture . . . are sufficiently outrageous to inflict severe emotional harm on family members," *Wang*, 2025 WL 785736, at *9 (cleaned up), as can be seen by Plaintiffs' declarations. *See, e.g.*, ECF No. 41-1 at 72 ("From [when my family member was captured] until his release, I was anxious and sad. I cried often. The stress was constant . . . it was very difficult for me to concentrate on my work."). And, as established above, North Korea's actions were undertaken intentionally, evincing at least reckless disregard for the emotional pain inflicted on the Pueblo crew's family members. The foreign nationals may thus hold North Korea liable for IIED.

With North Korea liable to all Plaintiffs, the Court now turns to calculating damages.[8]

**D. Damages**

Plaintiffs suing under the FSIA's cause of action can recover "money damages" for "personal injury or death" caused by a foreign sovereign's acts of terrorism, such as torture and hostage taking. 28 U.S.C. § 1605A(c). These damages are not limited to the victims of the terroristic acts; that family members may sue to recover can be seen in the FSIA's express contemplation of "solatium" damages, *K.E.F.V. by and through Vickers*, 135 F.4th at 991–92 (quoting § 1605A(c)), which may be given to "immediate family," defined as one's "spouse, parents, siblings, and children." *Bettis*¸ 315 F.3d at 331, 338. The estates of the victims and their

[8] The FSIA's statute of limitations imposes a cut-off date for lawsuits: the later of (1) 10 years after April 24, 1996, and 10 years after "the cause of action arose." 28 U.S.C. § 1605A(b). This timing provision is not jurisdictional, so it does not implicate the Court's power to decide the case. *Maalouf v. Islamic Republic of Iran*, 923 F.3d 1095, 1108 (D.C. Cir. 2019). And "by defaulting" and failing to "raise [this] affirmative defense in responding to a pleading," North Korea has forfeited this timing-based defense. *Id.* Moreover, district courts lack "authority to raise *sua sponte* the FSIA terrorism exception's statute of limitations when it has been forfeited by a defendant" like North Korea "who is entirely absent from the proceedings." *Id.* at 1109. So even though Plaintiffs' complaint, filed in January 2023, might struggle to overcome the FSIA's statute of limitations were the issue raised, the issue has not been raised, and the Court will not—cannot—address it unprompted.

immediate family may recover as well. *See* § 1605A(c)(4). Recovery may include both "past economic losses" that are "reasonably proved," as well any "future harm" that is proved with "reasonable certainty." *Hill v. Republic of Iraq*, 328 F.3d 680, 684 (D.C. Cir. 2003) (quotation omitted).

Plaintiffs suing under state tort law, on the other hand, are generally limited to the damages that would be available from their state cause of action, because the FSIA in such suits merely provides a waiver of sovereign immunity. *See Force v. Islamic Republic of Iran*, 617 F. Supp. 3d 20, 36 (D.D.C. 2020) ("Typically, damages would be calculated pursuant to the law under which liability was found." (cleaned up)). That said, courts in this district have repeatedly recognized that recovery under state IIED law that follows the Restatement (Second) of Torts and recovery under the FSIA for solatium are "functionally identical." *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 402 (D.D.C. 2015); *see also Jonathan Woodner Co. v. Breeden*, 665 A.2d 929, 936 (D.C. 1995) (permitting recovery for both compensatory and punitive damages for IIED); *Weatherly*, 304 A.3d at 589 n.3 (permitting recovery for immediate family for IIED). Thus, because the foreign national Plaintiffs here—the only Plaintiffs not proceeding under the FSIA's statutory cause of action for liability—are all immediate family members bringing an IIED claim, the Court will, for simplicity, assess their damages as if they were proceeding under the FSIA too.

In assessing damages, fairness requires the Court to "take pains to ensure that individuals with similar injuries receive similar rewards." *Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25, 54 (D.D.C. 2007), *abrogated on other grounds by Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9, 15 (D.C. Cir. 2015). The damages assessed should be consistent not only among the plaintiffs within the same case, but also with "prior awards for comparable injuries." *Winternitz v. Syrian Arab Republic*, No. CV 17-2104 (TJK), 2022 WL 971328, at *9 (D.D.C. Mar. 31, 2022). Accordingly, although it makes its own independent findings of fact, the Court will take into

Case 1:23-cv-01097-BAH Document 16 Filed 05/28/26 Page 25 of 31

account the damages calculation reached in *Pueblo I*. *See Doe A-1 v. Democratic People's Republic of Korea*, No. CV 18-252 (DLF), 2021 WL 723257 (D.D.C. Feb. 24, 2021) ("*Pueblo I Damages*"); ECF No. 61-1 at 35 (asserting that "Plaintiffs here are similarly situated to those in *Pueblo I*").[9]

Because the foreign national family members are grouped together with the U.S. national family members for calculating damages, the damage awards for Plaintiffs are divided into only two groups: (1) crew members themselves and their estates, and (2) the family members of the crews and their estates.[10]

**1. Compensatory Damages for Crew Members**

The crew members seek compensatory damages for two periods of time. The first is the 335-day period they spent in North Korean captivity. The second is for the entire post-release period, in which the crew members dealt with the lingering effects of their time in captivity.

**a. Pain and Suffering During Captivity**

The Court recognizes the "challenge aris[ing] in assigning a dollar value to such pain and suffering." *Hekmati v. Islamic Republic of Iran*, 278 F. Supp. 3d 145, 163 (D.D.C. 2017). Still, the Court finds guidance from the $10,000-per-day award that courts in this district "typically set" for "prolonged and abusive captivity." *Id.*; *see also id.* at 164 (collecting cases). This $10,000-per-day award is also what every Pueblo crew member has received in prior litigation. *See Pueblo*

[9] The *Massie* case also assessed damages for Pueblo crew members and their families. *See Massie*, 592 F. Supp. 2d 57. But because of the small number of plaintiffs in *Massie*, the greater recency of *Pueblo I*, and the doubt on aspects of *Massie*'s methodology cast by intervening precedent, *see, e.g.*, *Hekmati v. Islamic Republic of Iran*, 278 F. Supp. 3d 145, 164 (D.D.C. 2017) (declining to follow *Massie*'s calculation for post-imprisonment suffering), the Court looks only lightly to *Massie* for guidance.

[10] Plaintiffs do not request punitive damages. *See* ECF No. 13 ¶ 70. The Court is therefore prohibited from granting them. Fed. R. Civ. P. 54(c) ("A default judgment must not . . . exceed in amount, what is demanded in the pleadings.").

*I Damages*, 2021 WL 723257, at *2; *Massie*, 592 F. Supp. 2d at 77. The crew member Plaintiffs ask only for the same: $10,000 per day for the 335 days they were detained, a total of $3.35 million per crew member. ECF No. 61-1 at 36.

The Court agrees that the requested amount is warranted here. The uncontroverted evidence confirms that the Pueblo crew was held captive from January 23 to December 23, 1968, or 335 days. *See* ECF No. 48-3 at 394–95. During that period, they suffered physical and mental abuse, including repeated beatings and fake executions. *See id.* at 149, 154. Such treatment is at least as abusive as what has been found eligible for the $10,000-per-day award. *See Hekmati*, 278 F. Supp. 3d at 154 (detailing prison conditions). The Court will therefore award all crew member Plaintiffs and their estates $3.35 million for their time in captivity.

**b. Pain and Suffering After Captivity**

Unlike captivity damages, there are no typical values for the calculation of post-release harm. Thus, the crew member Plaintiffs ask as a baseline for this Court to follow the *Pueblo I Damages* calculation of $200,000 per year post-release so as to not treat similar crew members differently. ECF No. 61-1 at 39. In support, they have submitted myriad sworn declarations, military records, published accounts of the Pueblo incident, and contemporaneous news articles, all documenting the crew members' pain and post-release suffering, including psychological trauma and malnutrition. *See generally* ECF Nos. 41, 48. They allege that their time in captivity led to lasting negative changes, significantly straining their family relationships. *See, e.g.*, ECF No. 41-1 at 103 ¶¶ 8, 10 (detailing how a crew member was a "happy, easygoing person" before his captivity but "angrier," "withdrawn," and "suffering from PTSD" after). These experiences line up with what the *Pueblo I* and *Massie* courts found. *See Pueblo I*, 414 F. Supp. 2d at 119–20 (detailing how captivity "permanently scarred the crew members"); *Massie*, 592 F. Supp. 2d at 69–72 (same).

Once again, the Court finds the requested baseline amount warranted. While no two crew members' experiences are identical, Plaintiffs have not provided—and the Court does not discern—any reason to think that the crew members here suffered any more or less as a whole than the *Pueblo I* crew members after their release. The Court also finds that by providing a per-year figure rather than a lump sum, the *Pueblo I Damages* figure properly accounts for the "extent of the plaintiff's lasting physical and mental injuries" as well as "the estimated number of years that the plaintiff can be expected to suffer from these injuries," two factors important in determining FSIA damages for lingering pain and suffering. *Azadeh v. Gov't of Islamic Republic of Iran*, No. CV 16-1467 (KBJ), 2018 WL 4232913, at *19 (D.D.C. Sep. 5, 2018). The Court thus follows the well-considered $200,000 per-year award given in *Pueblo I.*

Now to determine the number of years relevant for each crew member Plaintiff. For the deceased crew members, represented by their estates, the total compensation is given by the number of years they lived after release from North Korean captivity. The table below, drawn from ECF No. 61-1 at 41, reflects these awards:

| Crew Member Plaintiff's Estate | Years Post-Release | Baseline Compensation |
|---|---|---|
| D-1 | 56 | $11,200,000 |
| I-1 | 40 | $8,000,000 |
| N-1 | 42 | $8,400,000 |
| Q-1 | 33 | $6,600,000 |
| T-1 | 29 | $5,800,000 |
| U-1 | 41 | $8,200,000 |
| V-1 | 34 | $6,800,000 |
| Z-1 | 40 | $8,000,000 |
| BB-1 | 47 | $9,400,000 |
| CC-1 | 34 | $6,800,000 |
| FF-1 | 57 | $11,400,000 |

The living crew members, on the other hand, will be awarded the number of years that they are expected to live after their release from captivity. Following *Pueblo I Damages*, the Court will draw its life expectancy data from the CDC. *See* U.S. Department of Health and Human Services

Centers for Disease Control and Prevention, National Vital Statistics Reports, Vol. 74, No. 6, pp. 12-13 (July 15, 2025). The table below, applying the CDC's life expectancy data rounded to the nearest half-year to the age information drawn from ECF No. 61-1 at 41, arrives at the awards below:

| Crew Member Plaintiff | Current Age | Estimated Life Expectancy | Estimated Years Post-Release | Baseline Compensation |
|---|---|---|---|---|
| F-1 | 80 | 8.5 | 66 | $13,200,000 |
| K-1 | 84 | 6.5 | 64 | $12,800,000 |
| R-1 | 80 | 8.5 | 66 | $13,200,000 |
| AA-1 | 78 | 10 | 67.5 | $13,500,000 |

On top of these baseline awards, Plaintiffs also single out two crew members who "suffered particularly severe beatings and torture, resulting in exceptionally serious and disabling post-release injuries." ECF No. 61-1 at 42. "In such 'severe instances of physical and psychological pain,' upward adjustments from the baseline lump sum award are appropriate." *Pueblo I Damages*, 2021 WL 723257, at *6 (quoting *Valore*, 700 F. Supp. 2d at 84 (D.D.C. 2010)). Plaintiff Q-1, as result of a "brutal eight-hour beating during 'Hell Week'" combined with "severe malnutrition," "suffered permanent damage to both eyes" and was left with "permanent central vision loss in both eyes for the rest of his life." ECF No. 61-1 at 42 (citing ECF No. 41-6 at 9–11, 42–44). Plaintiff Z-1 "was among the few crewmembers injured during North Korea's initial attack on the Pueblo" and "sustain[ed] a painful shrapnel would to his arm that went untreated throughout his 11-month captivity." *Id.* at 43. Due to "his role as a Communications Technician," he was also "singled out for interrogation[s] and torture." *Id.* (quoting ECF No. 41-8 ¶ 37). The combination of his untreated shrapnel wound and his extensive torture resulted in severe gastrointestinal problems as well as "multiple joint problems," all of which the VA determined was "due to and proximately the result of" his time in military service, including his time as a North Korean captive. ECF No. 41-8 at 40–56. The Court finds that an upward adjustment for these two Plaintiffs is appropriate

Case 1:23-cv-01027-BAH Document 69 Filed 05/09/26 Page 29 of 31

on account of their extensive and well-documented post-release medical issues. Accordingly, the Court will add $2 million in compensatory damages for each, the amount requested.

### 2. Compensatory Damages for Family Members

The family members of the Pueblo crew and their estates, on the other hand, are awarded compensatory damages in a more uniform manner. They seek compensation for their emotional distress in the form of solatium damages. Although solatium damages, "intended to compensate persons for mental anguish, bereavement and grief," are "by their very nature unquantifiable," courts in this district have coalesced around using the "so-called '*Heiser*' framework" to award them "in cases of hostage-taking or torture." *Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 72 (D.D.C. 2015); *see also id.* at 72–73 (collecting cases applying *Heiser*). Under the *Heiser* framework, "where the victim does not die, but instead only suffers injury . . . Spouses receive $4 million, parents [and children] receive $2.5 million, and siblings receive $1.25 million." *Id.* (cleaned up). These amounts are recoverable so long as the evidence shows that the family members "suffered mental anguish" because of the hostage-taking and torture. *Roth*, 78 F. Supp. 3d at 405.

Such evidence exists in spades for each of the 104 family members here. *See generally* ECF Nos. 41, 48, 65-1. Thus, because *Pueblo I Damages* awarded damages under the *Heiser* framework, and because there is no apparent reason to distinguish this case from *Pueblo I* or the many other FSIA cases that have applied *Heiser*, the Court will do so as well. The spouses of the crew members, Plaintiffs E-2, H-3, P-1, CC-2, G-1, M-2, U-2, and V-2, will each be awarded $4 million. ECF No. 16-1 at 3–14. The parents of the crew members, Plaintiffs H-1, H-2, K-2, K-3, N-3, Q-2, S-2, S-3, T-2, T-3, W-2, W-3, Y-1, Y-2, Z-3, Z-4, AA-2, AA-3, BB-2, CC-3, CC-4, EE-1, FF-2, FF-3, GG-2, I-2, and I-3, will each be awarded $2.5 million. *Id.* The children of the crew members, Plaintiffs E-3, G-2, G-4, M-1, P-2, P-3, T-5, U-3, V-3, V-4, V-5, CC-5, HH-1, P-4, and

E-14, will also be awarded $2.5 million. *Id.* And the siblings of the crew members, Plaintiffs E-1, E-4, E-5, E-6, E-7, E-9, E-10, E-11, E-12, E-13, J-1, J-2, J-3, J-4, J-5, J-6, K-4, K-5, K-6, L-1, L-2, Q-3, W-1, W-4, AA-4, AA-5, AA-7, CC-6, DD-1, FF-4, FF-5, I-4, I-5, I-6, I-7, I-8, I-9, K-7, K-8, O-1, S-1, T-4, X-1, Z-2, AA-6, EE-2, FF-6, FF-7, FF-8, FF-9, GG-1, and E-8, will be awarded $1.25 million. *Id.*

In addition to the *Heiser* baseline amounts, the family member Plaintiffs argue that they should be awarded an additional across-the-board "25% upward adjustment," arguing that the severity of their emotional distress warrants additional compensation. ECF No. 65-1 at 94. Plaintiffs highlight the difficulties the crew members' spouses endured during the 335 days of captivity, as well as the struggle that continued upon their husbands' return. They report that "each [wife] experienced fear for their husband's safety and deep anxiety at the thought of never seeing them again . . . [and] continued to experience acute distress and struggled as they witnessed their husbands trying to cope with their physical and psychological injuries." *Id.* at 96–97. The same is true for the crew's parents. *See id.* at 97. Plaintiffs also provide declarations from the crew's sons and daughters who report feeling as though they were "robbed of [a] childhood." *Id.* at 51 (quotation omitted). And Plaintiffs' evidence shows that all family members in general felt the "emotional strain of living of a loved one whose trauma manifested in uncontrollable, and at times violent, behaviors." *Id.*

Plaintiffs point out, rightly, that awarding such an increase would not be unprecedented. A court in this district recently awarded a 25% upward adjustment to the *Heiser* values for a terrorist attack that included torture and kidnapping. ECF No. 65-1 at 94 (citing *Shourd v. Gov't of Islamic Republic of Iran*, No. CV 22-1309 (RJL), 2024 WL 4346330 (D.D.C. Sep. 30, 2024)). Plaintiffs also cite two further cases in support: *Acree v. Republic of Iraq*, 271 F. Supp. 2d 179 (D.D.C. 2003), *vacated on other grounds*, 370 F.3d 41 (D.C. Cir. 2004), *see* ECF No. 65-1 at 79, and *Cicippio v.*

*Islamic Republic of Iran*, 18 F. Supp. 2d 62 (D.D.C. 1998), *see* ECF No. 61-1 at 49. Both awarded family members more than what the *Heiser* framework would award. Plaintiffs urge this Court to follow suit.

The Court sympathizes with the family member Plaintiffs and appreciates the magnitude and duration of their suffering. But nothing in the record suggests that they have suffered more than the family members in *Pueblo I*. And to award the family members in this case 25% more than the comparable family members in *Pueblo I* would violate the "general precept that similar awards should be given in similar cases." *Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16, 26 (D.D.C. 2011). While Plaintiffs are correct that the *Shourd* court awarded a 25% upward adjustment on somewhat comparable facts—family members were held hostage for "hundreds of days" in a "squalid" Iranian prison, *Shourd*, 2024 WL 4346330, at *2, 6—this single post-*Heiser* case cannot by itself overcome the strong fairness concerns that lead the Court to align the damages it will award to those approved in *Pueblo I*. Moreover, the other two cases Plaintiffs cite that "granted higher awards for family members in hostage-taking cases . . . predated the emergence of the *Heiser* framework" and are therefore less persuasive now that *Heiser* has "gained strong precedential support." *Pueblo I Damages*, 2021 WL 723257, at *8 (quotation omitted). For these reasons, the Court will hew to *Heiser* without adjustment for these Plaintiffs.

## IV. Conclusion

For all these reasons, the Court will grant Plaintiffs' Motion for Default Judgment. A separate order detailing total compensatory damages by Plaintiff will issue.

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: May 28, 2026